322 So.2d 257 (1975)
Earnest SMITH
v.
Thomas A. DeVINCENT et al.
No. 12734.
Court of Appeal of Louisiana, Second Circuit.
November 6, 1975.
*259 George L. Hayes, Jr., Shreveport, for defendants-appellants.
Burnett, Harrison, Sutton & Walker by Glenn E. Walker, Shreveport, for plaintiff-appellee.
Before PRICE, DENNIS and MARVIN, JJ.
MARVIN, Judge.
DeVincent and Pate, lot owners in a subdivision, appeal from an injunctive *260 judgment which ordered them to remove trailers or mobile homes they had placed on their respective lots. Plaintiff-appellee, also a lot owner, sought this relief on the grounds that the subdivision regulations were being violated by appellants.
The subdivision regulations contain only five specific restrictions, which we quote:
"1. No building shall be located nearer than 150 feet to the front lot line and/or nearer than 15 feet to the interior lot line; however, the set back restriction from the front lot line does not apply to the location of a well house.

"2. No residence shall be constructed on any lot containing less than 900 feet of floor space on ground floor thereof exclusive of porches and/or car ports or garages.

"3. No residence shall be occupied until completely finished on exterior including the application of not less than two coats of paint.
"4. No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used on any lot at any time as a residence either temporarily or permanently.

"5. No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighbors." (Emphasis Supplied)
Oral reasons were given for the judgment below but are not included in the record before us.
Both DeVincent and Pate placed mobile homes on their lots which are used as residences. DeVincent's home is 14 × 80 feet. Pate's home is 14 × 70 feet. DeVincent removed the springs, axles, wheels and tow bar of his mobile home and placed it on concrete piers Pate's mobile home, while on cinderblocks, has not been so modified because, as he explains, he is awaiting a final decision of this litigation before he incurs the expense. The mobile home of each appellant is connected to utilities and to a septic tank. There are eight lots in the subdivision, each approximately 166 × 1287 feet, seven of which are occupied, while the lot of the appellee has remained vacant. Appellee explains that he is awaiting a final determination of this litigation before he decides whether or not to construct a residence on his lot.
Appellants contend a mobile home is to be distinguished from a trailer, especially when it has been modified or immobilized such as DeVincent's home and alternatively, that the restrictions prohibit only the use of a "trailer" as a residence and not the existence of a "trailer" otherwise on the lot. Appellee and Appellants note that these issues are res nova in Louisiana appellate courts. We are furnished by both counsel with excellent reviews of several decisions from other states which are parenthetically enlightening, but of course, are not binding, as counsel recognize.
Notwithstanding the absence of Louisiana cases directly in point, we are not without jurisprudential principles for interpretation of such restrictions.
In Salerno v. DeLucca, 211 La. 659, 30 So.2d 678, 679-680, 1947, our Supreme Court stated:
"It is the well established jurisprudence of this state that where restrictions have been inserted in deeds in pursuance of a general plan devised by the ancestor in title to maintain certain building standards and uniform improvements, such as those here under consideration, they are valid and enforceable. . . These are real rights or covenants that run with the land for the benefit of land owners within the area and to prevent the violation of these restrictions injunction proceedings may be resorted to . . .
"Although these stipulations are stricti juris and every doubt should be *261 resolved in favor of the unencumbered use of the property, whenever differences arise as to the extent or limitation of these restrictions, we must look to the intention of the party encumbering the property from the words used in the stipulations in the deed, consideration being given to the entire context of the instrument rather than to a single phrase or clause, for obviously those acquiring the property in the restricted area were motivated and influenced to purchase the same because of these limitations and they are entitled to the presumption that they will be fairly and faithfully complied with." (Citations omitted)
Professor A. N. Yiannopoulos in his Article, Real Rights: Limits of Contractual and Testamentary Freedom, summarizes the codal and jurisprudential authorities in this way:
"According to well-settled Louisiana jurisprudence, documents establishing building restrictions are subject to strict interpretation. Any doubt as to the existence, validity, or extent of building restrictions must be resolved, therefore, in favor of the unrestricted use of the property. Thus, when there was doubt as to the intent of a person to impose restrictions, or as to the existence of a general plan, the doubt was resolved in favor of the owner whose property was allegedly restricted.
"Apart from the rule of strict interpretation, documents establishing building restrictions are subject to the general rules of the Louisiana Civil Code of 1870 governing the interpretation of juridical acts. Words used are to be understood in the common and usual signification; terms of art or technical phrases are to be interpreted according to their received meaning . . ." 30 La.L.R. 44, 73-74 (Footnotes omitted)
While all restrictions are sometimes loosely referred to as building restrictions, it should be noted that restrictions generally fall into two classes: a "building" restriction, which limits the type and size of structures which may be placed on the property, and a "use" restriction, which limits the uses which may be made of permitted structures. A restriction may be both a building and a use restriction, as in Beyt v. Woodvale Place Apartments, 297 So.2d 448 (La.App. 3d Cir., 1974), wherein it was noted that the violation of the restriction was "both as to use . . . and as to the construction of a structure. . ." See also, LeBlanc v. Bowen, 238 So.2d 369 (La.App. 4th Cir., 1970). On the other hand, a building restriction and use restriction may be wholly independent of one another and one is not to be extended so as to include the other unless the intention to do so is clearly and expressly stated. See also, Covenants, Conditions and Restrictions, Sections 189-190, 20 Am. Jur.2d 758-760. In Jones v. Park Lane, 384 Pa. 268, 120 A.2d 535, 538 (1956), the Supreme Court of Pennsylvania observed:
"Restrictions limiting the right of the owner to deal with his land as he may desire fall naturally into two distinct classes, the one consisting of restrictions on the type and number of buildings to be erected thereon, and the other on the subsequent use of such buildings. The restrictions in the former class are concerned with the physical aspect or external appearance of the buildings, those in the latter class with the purposes for which the buildings are used, the nature of their occupancy, and the operations conducted therein as affecting the health, welfare and comfort of the neighbors. A building restriction and a use restriction are wholly independent of one another, and, in view of the legal principles above stated, the one is not to be extended so as to include the other unless the intention so to do is expressly and plainly stated; to doubt is to deny enforcement . . .
". . . Numerous similar illustrations might be given of restrictions expressly *262 covering both the type of buildings to be erected upon the land and limitations upon their subsequent use."
Salerno, supra, tells us that whenever "differences" [of reasonable-minded persons] arise as to the extent or limitation of restrictionsand we interpret this to mean whether the restriction affects either or both the structures which may be placed on the property and the uses which may be made of permitted structureswe must look to the intention of the party encumbering the property from the entire content of the instrument. In the light of these principles of interpretation, we shall examine the five restrictions in question.
Restriction number one speaks of the location of a "building" and a "well house" as distinguished from a "residence" which is the subject of restrictions two and three. Number four speaks of a "shack, garage, barn or other outbuilding," among other things. This arrangement and language leads us to conclude that the subdivider clearly contemplated and intended that "buildings," including shacks, garages, barns and outbuildings such as well houses, could be placed on a subdivision lot, but subject to the set-back and other provisions of the subdivision regulations.
The word "shack" in restriction four is used before the words garage and barn, and does not convey to us the meaning of a "ramshackle" or a "dilapidated" building, but obviously is used synonymously for the word "shed," in the sense that we speak of a "toolshack," "cookshack" or "workshack," which may in themselves be relatively permanent and substantial. It would be unreasonable to conclude that a subdivider would go to the time and expense of restricting property and declaring in the restrictions that a ramshackle, dilapidated, shanty-type structure or "shack" in that context was permissible.
A "basement," as in restriction four, certainly indicates a permanent type structure, but nonetheless, its use as a residence is prohibited. A basement, as conventionally employed in home building, becomes a part of the permanent residence, and of course, is eventually used as a part of the residence. The prohibition of this paragraph in this respect is against the use of a basement alone as a residence and not against its use as a part of the ultimate residence. This conclusion is strengthened by the declaration in paragraph three that "no residence shall be occupied until completely finished on the exterior . . ."
We conclude from the set of restrictions as a whole, that the subdivider intended primarily a residential development of the property, allowing for outbuildings, well houses, garages, barns, even tents, sheds (or shacks) and trailers to be placed on the property as prospective individual lot owners might desire, but prohibiting anyone to occupy or use a residence anything other than a "completely finished (residence) on (the) exterior." It should be noted here, that the property is not, and when subdivided in 1964, was not in the city limits. Thus a lot owner could construct a well house, barn or a basement at one time and wait months or years before constructing a residence. Even then he could not "use" as a residence these other things at any time and he could not "occupy" a residential structure until he completely finished it on the exterior. Once the residence was completely finished exteriorly (as in the case of a "shell home"), the owner could then occupy the home and finish completion of the interior notwithstanding the degree to which the interior might be incomplete.
Restrictions two and three speak of a residence being "constructed" and being "completely finished on exterior, including the application of two coats of paint." When considered with the other provisions of the restrictions, these provisions obviously contemplate the erection of a frame-type home relatively common to rural areas of north Louisiana. We take *263 judicial notice that there existed on the market pre-fabricated and partially prefabricated residential structures, of wood and of metal such as aluminum, at the time the restrictions were drawn. We also take note that there were then and are now, brick, stone and masonry homes available to rural lot owners, some of which may not require painting. Certainly, there is no prohibition against constructing a brickfaced residence on the property. A residence which requires painting, however, is required to have two coats of paint.
We also note that mobile homes or house trailers have been on the market for several decades, and were then and are now available to rural lot owners. By whatever name, these homes convey to reasonable minds a rather elongated structure (10 to 14 feet in width by 40 to 80 feet in length), capable of being towed on the highways, with axles and wheels attached to the frame of the structure. The very name mobile or trailer conveys this meaning. The overall appearance, as distinguished from exterior decor, of one mobile home is not grossly dissimilar to another, and in the eyes of reasonable men, they all "look alike." We also take note that occasionally they may be immobilized on a particular location, but nonetheless, remain capable of being mobilized without too much effort and expense. They are not so much "constructed" or "assembled" even in a small part on the location the owner desires but are "connected" to sewerage and utilities. Indeed one of their greatest selling points is their complete containment, ease of connection, and mobility. They are to be distinguished from pre-fabricated or partially pre-fabricated homes of aluminum or similar exterior which, when fully assembled, look more similar to a residential structure of the types used in north Louisiana than mobile homes or trailers of the type then and now situated on many lots in this area. We note this distinction of the appearance because this subdivider was obviously concerned with the "outside" appearance of residences in his subdivision. In restriction number three, the subdivider stated that no residence would be occupied until it was "completely finished" as to the exterior. It is reasonable to conclude that the subdivider contemplated that a lot owner who conformed to the residential building and complete finishing requirements would not detract from his residence by erecting a shoddy-appearing well house, barn, garage or other outbuilding. We conclude therefore, that the subdivider here intended the residential structure on each lot would be something other than a self-contained mobile home or trailer house.
We construe the subdivision regulations and hold that numbers one, two and three, pertaining to set back, floor space and exterior finish requirements are building restrictions. Restriction four is a use restriction only and should not be broadly interpreted so as to extend its meaning to that of a building restriction which would require removal of a mobile home from a lot.
If this subdivider had intended to prohibit the placement of trailers (or mobile homes), temporary structures, even barns, sheds or outbuildings on the subdivided property, as well as to prohibit their "use" as a residence, the restrictions should have and could have been phrased so as to expressly and unequivocally provide.
Presented here is an example of imprecise draftsmanship and our ruling herein should serve as notice to those who would restrict either or both the structures on their property and the uses which may be made of permitted structures to be precise in drafting restrictive covenants.
In a Montana case,[1] this restriction was under consideration:
"`No structure of a temporary character, trailer, basement, tent, shack, garage, *264 barn, or other out building shall be used on any lot at any time, as a residence, either temporarily or permanently, nor shall any residential structure be occupied for residential purposes until completely finished.'"
In a Texas case,[2] this was the restriction:
"`No trailer, tent, shack, stable or barn shall be placed, erected or be permitted to remain on any lot, nor shall any structure of a temporary character be used at any time as a residence.'"
In each case, the defendant immobilized his mobile home by removing the wheels therefrom, placed it on a concrete block foundation and was sued for being in violation of the restrictive covenant. Certainly, the restriction in the Texas case was more of a "building" restriction than the restriction in the Montana case. Texas held the mobile home not to be a trailer and allowed it to remain on the property as a residence. Montana held the mobile home to be a trailer and the restriction to be a building or structural restriction, compelling its removal. This is only one example of the variance in results in other jurisdictions. Montana cites Iowa and Ohio cases in support of its holding. Texas cites New York and Vermont cases in support of its holding. None of these cases discuss or employ principles of interpretation which are afforded by our code and jurisprudence. We choose not to resort to the holdings in other jurisdictions, but to employ the civil law principles of interpretation which are afforded us, in making a determination of the issues presented.
We do not hold that a mobile home is a trailer under every circumstance. We hold only under the circumstances and under the subdivision regulations which we are required to interpret that the mobile homes of the defendants are trailers, against which there is no restriction as to remaining on the property but which, by restriction number four, may not be used temporarily or permanently as residences.
For the reasons expressed herein the judgment of the lower court is therefore amended and recast to read as follows:
It is ordered, adjudged and decreed that:
(A) Defendant, Thomas A. DeVincent, and anyone acting at his direction and consent, as to Lot 8 of the Floy Lynn Estates; and
(B) Defendant, Jack D. Pate, and anyone acting at his direction and consent, as to Lot 6 of the Floy Lynn Estates, Caddo Parish, Louisiana,
are hereby permanently enjoined and prohibited from using as a residence, either temporarily or permanently, any mobile home which now is or which may be situated on the respective numbered subdivision lot to each defendant.
Costs below are assessed to defendants-appellants. Costs on appeal are assessed one-half against plaintiff-appellee and one-half against defendants-appellants.
NOTES
[1] Timmerman v. Gabriel, 155 Mont. 294, 470 P.2d 528 (1970).
[2] Hussey v. Ray, 462 S.W.2d 45, Tex.Civ.App. (1970). See also Crawford v. Boyd, 453 S.W. 2d 232, Tex.Civ.App. (1970), and contra, Bullock v. Kattner, 502 S.W.2d 828, Tex.Civ. App. (1973).