938 So.2d 1084 (2006)
Raymond HEAD, Jr., et al., Plaintiffs-Appellees
v.
Adolphus Lee GRAY and Richard Mutter and Cindy Mutter, Defendants-Appellants.
No. 41,290-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
*1085 Davidson, Jones & Summers, by Allison A. Jones, Shreveport, for Appellants.
Smith & Jacobs, by Charles A. Smith, Edward C. Jacobs, Springhill, for Appellee.
Before WILLIAMS, GASKINS and CARAWAY, JJ.
CARAWAY, J.
Owners in a subdivision brought this action to enjoin the use of a manufactured home on a neighbor's lot based upon a recorded building restriction. The building restriction which was part of the general plan for the residential development was directed against temporary structures, including mobile homes. Defendants' home, which was designed in two sections for placement on a permanent foundation, was ordered to be removed from the subdivision by the trial court. Finding doubt as to the extent of the building restriction, we reverse.

Facts
Cypress Point Subdivision adjoins Cypress Bayou Reservoir in Bossier Parish. In July 1977, the Estate of W.B. Jacobs, Inc. ("Jacobs, Inc.") subdivided the land comprising the subdivision. As a part of this process, Jacobs, Inc. declared and recorded protective covenants and building restrictions (hereinafter "Covenants") governing the use of subdivision property. The disputed restriction, labeled "Temporary Structures" (Restriction # 8, infra), provides that no "mobile home" shall be placed or used on a subdivision lot.
Richard and Cinder Mutter now occupy Lot 8, Cypress Point Subdivision. The Mutters own a home manufactured by Franklin Homes, Inc. The Mutters' home was previously in another subdivision nearby for a period of time but was not secured on a foundation there and its roof was apparently never finished. On a date not specified in the record, the Mutters had the home moved to the Cypress Point lot. The structure's two sections were then completely assembled and attached to the foundation.
Thereafter, a group of Cypress Point lot owners brought this action for injunctive relief against the owner of Lot 8, Adolphus Lee Gray, and the Mutters claiming a violation of the Covenants by the Mutters' construction of their modular/mobile home on the lot. Plaintiffs asked the court to prohibit the defendants "from allowing the placement of said mobile home or manufactured home in said subdivision. . . ." Plaintiffs subsequently filed an amended petition recognizing that the Mutters had already placed and assembled the home on the site and seeking an injunction for its removal.
None of the parties testified at trial. However, Russell Foster[1] testified that his modular home was placed on a lot next to Lot 8 in August 2003. The structure was placed on the concrete foundation one section at a time by a crane and attached to the foundation and bolted together. Although he characterized the home as a *1086 permanent dwelling, he acknowledged it could be moved like any other permanent home. Foster also identified photos of various lots with outbuildings, sheds, metal garages, motor homes and other temporary structures which were allegedly out of compliance with the building restrictions.
Photographs showing the transport and assembly of the Mutters' home were also submitted into evidence. This home was comprised of rectangularly-shaped sections, approximately 75 feet long by 15 feet wide. The interior length of each module was exposed so the two sections could be fastened together on site to complete the unified structure. The sections were framed with wooden studs and rafters like a site-built dwelling and the pitch of the roof line produced some attic space. The home sections comply with the same building codes applicable to site-built homes.
After completion of construction, each module is put on a separate, wheeled chassis that permits transportation from the factory. This road chassis is removable and does not furnish any structural integrity to the completed unit. The assembled home is not equipped with wheels.
The foundation for the Mutters' home consisted of a concrete footing poured around the perimeter for the 75' x 30' home. Along the centerline of the foundation where the two sections are joined, a series of cement cinder block piers support the structure.
At the close of trial, the court concluded that the placement of the Mutters' home was prohibited by the Covenants and signed a judgment granting a permanent injunction against the placement of the home in the subdivision. It is from this judgment that defendants appeal.

Discussion

I.
Defendants first argue that the restrictions are invalid because the public records contain no evidence that Neilson S. Jacobs had the authority, by corporate resolution, to act on behalf of Jacobs, Inc. to establish the restrictions in 1977. Plaintiffs respond by citing the prescriptive protection against challenges to the lack of such recorded corporate acts provided in La. R.S. 9:5681, as follows:
A. (1) Any action to set aside a sale, transfer, lease, mortgage, encumbrance, or any other document by any legal entity or unincorporated association affecting any immovable property located in this state on the ground that the officer, agent, or other representative of the legal entity or unincorporated association signing the document was without authority to do so is prescribed by ten years, reckoning from the day the act of sale was recorded in the mortgage or conveyance records, or both as applicable, of the parish in which the immovable property is located. Nothing contained in this Section shall be construed to limit or to establish a prescriptive period as to any proceeding which may arise between the legal entity or unincorporated association and the person acting in a representative position.
There is no evidence in this case of any lawsuit successfully challenging the authority of Jacobs to act for the corporation. Such a suit could have in turn affected the rights of parties, such as plaintiffs, who acquired their property in reliance upon the recorded Covenants. With no successful challenge to the instrument having previously occurred, plaintiffs gain the protection of this ten-year prescription. Accordingly, the time for raising any challenge to Jacobs' authority to act for Jacobs, Inc. has expired. This claim attacking the force of the Covenants is without merit.

*1087 II.
Building restrictions are governed by the Louisiana Civil Code Articles 775, et seq. Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions. La. C.C. art. 777. Building restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction. La. C.C. art. 782.
Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable. La. C.C. art. 783. See generally Tri-State Sand & Gravel, L.L.C. v. Cox, 38,217 (La.App. 2d Cir.4/7/04), 871 So.2d 1253, writ denied, XXXX-XXXX (La.9/24/04), 882 So.2d 1144. The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter. Id. The law favors the free and unrestrained use of immovable property, and it follows that any doubt as to the interpretation of a servitude encumbering property must be resolved in favor of the property owner. McGuffy v. Weil, 240 La. 758, 125 So.2d 154 (1960). The intention of the proprietor to establish a servitude must clearly appear from the title document. McGuffy v. Weil, supra, citing Noel Estate v. Kansas City Southern & Gulf Ry. Co., 187 La. 717, 175 So. 468 (1937). From these principles, if the instrument purporting to create a building restriction is susceptible to two or more reasonable interpretations thereby creating ambiguity and doubt as to the subdivider's intent, the interpretation that least restricts the property will apply regardless of an actual intent for a greater restriction.
There are various provisions in the Covenants for this subdivision which should be reviewed in order to place the disputed "Temporary Structures" restriction in context. We consider the following restrictions of the Covenants relevant for our interpretation of the disputed provision:
1. LAND USE AND BUILDING TYPE. No lot shall be used except for residential purposes. No building or structure shall be erected, altered, placed, or permitted to remain on any lot other than one single family dwelling, private garage, carport, and associated lakeshore structures. No garage apartments shall be erected on any lot. . . .
2. DWELLING SIZE. The habitable heated area of the main structure, exclusive of open porches and garages, shall be not less than 1200 square feet.

* * *
4. LOT AREA AND WIDTH. No dwelling shall be erected or placed on any lot having a width of less than 65 feet at the minimum set back line. . . .

* * *
8. TEMPORARY STRUCTURES. No structure of any temporary character, trailer, mobile home, tent, shack, barn, or other similar outbuilding shall be placed or used on any lot at any time as a residence either temporarily or permanently.

* * *
16. ARCHITECTURAL CONTROL. No building or fence shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure and/or fence have been approved by the Architectural Control Committee as being in compliance with these covenants. The Committee's approval or disapproval as required in these covenants shall be in writing. *1088 In the event the Committee or its designated representative fails to approve or disapprove within 30 days after plans and specifications have been submitted to it, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.[2]
From a jurisprudential context, it is noteworthy that closely similar versions of the language of Restriction # 8 have been the subject of a rich history of dispute in Louisiana and other states. See, Smith v. DeVincent, 322 So.2d 257 (La.App. 2d Cir. 1975), and cases from other states cited therein; Jackson Square Towne House Homes Ass'n, Inc. v. Mims, 393 So.2d 816 (La.App. 2d Cir.1981); Mitchell v. Killins, 408 So.2d 969 (La.App. 2d Cir.1981); Webb v. Johnson, 95-1518 (La.App. 3d Cir.4/3/96), 671 So.2d 1120; Ritter v. Fabacher, 517 So.2d 914 (La.App. 3d Cir. 1987); Mouille v. Henry, 321 So.2d 377 (La.App. 3d Cir.1975). These cases suggest that the language and phraseology of Restriction # 8 have some common source, possibly evolving from an early formulary. With changing contexts for employing the restriction, some alteration in its language and differing schemes envisioned for individual subdivision plans, disputes have arisen.
Most of these cases, including our initial review of language closely similar to Restriction # 8 in Smith, deal principally with the issue of whether the use of "trailer" alone in early versions included the concept of mobile home. As Smith points out, cases in other states gave conflicting answers to that question. Some of the above cases also discussed the degree of permanent attachment or immobilization in situations where the chassis, wheels and tongue/tow bar were removed from a mobile home and the remaining structure was placed on piers and other such foundations. Finally, the Smith case had to address the phrase, "used on any lot at any time as a residence either temporarily or permanently." Unlike the present Covenants, which make clear that "residential purposes" is an overriding restriction on the lots in Cypress Point Subdivision, the limited set of covenants in Smith had no such general restriction. Therefore, the Smith court was restrained to conclude, rather anomalistically, that while the defendants' mobile homes were included within the meaning of the word "trailer" as used in the restriction in that case, the defendants were not required to remove their mobile homes/trailers from the subdivision because of the lack of a clear building restriction prohibiting their placement in the subdivision. The owners in Smith were only enjoined from using their mobile homes as residences within the subdivision. The court concluded:
If this subdivider had intended to prohibit the placement of trailers (or mobile homes), temporary structures, even barns, sheds or outbuildings on the subdivided property, as well as to prohibit their `use' as a residence, the restrictions should have and could have been phrased so as to expressly and unequivocally provide.
Presented here is an example of imprecise draftsmanship and our ruling herein should serve as notice to those who would restrict either or both the structures *1089 on their property and the uses which may be made of permitted structures to be precise in drafting restrictive covenants.
Smith, supra at 263.
In contrast to the limited set of restrictions in Smith, our later ruling in Mitchell, supra, involved subdivision covenants with a "residential purposes" restriction almost identical to Restriction # 1 of the present Covenants and a "Re-location of Buildings" restriction which required every residence to be constructed on site. This court therefore affirmed the mandatory injunction granted by the trial court in Mitchell for removal of a mobile home immobilized in the subdivision. The "temporary structure" restriction in Mitchell was identical to the disputed restriction central to the Smith ruling. Yet, because the entire set of restrictions for each subdivision differed, the outcomes of the two cases using the very same restriction were different.
Smith and Mitchell demonstrate the importance of considering the entire framework for the subdivision's "general plan" which is identified in the Civil Code definition for building restrictions under Article 775. As the Civil Code further provides, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. art. 2050. Accordingly, we first examine the overall context or "general plan" for the Cypress Point Subdivision as reflected in the above quoted restrictions.
Restriction # 1 of the Covenants begins with a general prohibition against uses other than for "residential purposes." More significantly, the second sentence specifically limits the subdivision lots, listing the "single family dwelling, private garage, carport, and associated lakeshore structures" as the only structures permitted on them. This would arguably prohibit certain things listed in Restriction # 8, such as an "RV trailer," "tent," "shack" and "barn," from use as a structure on the lots since these are not generally understood as structures for the accommodation of a "single family dwelling." Thus, the limitation of Restriction #8 is in many respects already addressed by the broad limitation of Restriction # 1. Nevertheless, it adds explanation by addressing "outbuildings" of a "temporary character," so as to make it more than superfluous.
The next important contextual feature of these Covenants is the consistent use of the term "placed" as it pertains to buildings and structures. Most of the quoted restrictions discuss an allowance for structures to be "placed" on a lot, and three of them specifically use "placed or erected" as contrasting verbs. This indicates that a house with a pier-and-beam structure built long before the advent of mobile homes and modern manufactured housing could be brought in and "placed" on the same foundation which the Mutters constructed for their home. Such house might have a roof pitch and attic space like the Mutters' home so that its aesthetic features would be virtually the same. Unlike the "Re-Location of Buildings" restriction in Mitchell, which required every residence in that subdivision to be constructed on site, the Covenants for Cypress Point do not prevent a home built elsewhere from being moved and placed in the subdivision.
A third feature of these building restrictions is their lack of specific limits on aesthetic features. Aesthetic considerations play a small part in these Covenants when dealing with square footage for the homes and minimum setback lines. The Covenants do not however attempt to specify particular construction features, such as brick veneer or roof material or pitch, that might have a more pronounced *1090 aesthetic impact on the subdivision and tend indirectly to restrict the use of manufactured housing. See, Travosos v. Stoma, 95-1568 (La.App. 3d Cir.4/3/96), 672 So.2d 1070, writ denied, 96-1633 (La.9/27/96), 679 So.2d 1343. Thus, any objections by the plaintiffs that might relate to the aesthetic features of the Mutters' manufactured home gain no support by affirmative or negative duties set out in the Covenants so as to sanction an injunction for the home's removal.
Last, before considering the meaning and scope of the term "mobile home," the context of Restriction # 8 must be reviewed. This restriction expresses certain general concepts that do not relate to the Mutters' home. First, the restriction is labeled "Temporary Structure" and its language speaks of a "temporary character" for the listed structures. This is aimed as a restriction on the way the building is built. The Mutters' home rests on a foundation like any other pier-and-beam home that might have been constructed on site. That concrete foundation may be considered as permanent in that it is embedded in the ground and cannot be removed without destroying its structure. The fact that an assembled manufactured home is placed on a foundation and may be disassembled and removed does not mean that the Mutters' home is a "temporary structure" with a "temporary character." It is more reasonable to characterize this home, like any pier-and-beam home constructed on site, as permanent in nature. Restriction # 8 also concludes its specific listing of structures with the phrase "or other similar outbuilding," reflecting a use restriction. Unquestionably, every structure identified in Restriction # 8 can be used as an outbuilding, or a structure separate in its identity and use from the principal "single family dwelling" of each residential lot. The Mutters' manufactured housing, however, is not being used as an outbuilding. Thus, the general expressions within Restriction # 8  "temporary" "outbuildings"  arguably define its prohibitory focus, and the Mutters' home does not fall within that focus.
Plaintiffs' position is that Restriction # 8 must be interpreted literally, that "no mobile home . . . shall be placed or used" on Cypress Point lots, and that this interpretation controls without regard to any other contextual expressions in the restriction itself or in the Covenants. They also maintain that the meaning of "mobile home" includes within its scope the Mutters' double-wide manufactured structure.
From our review of the law and jurisprudence, we find various expressions attempting to define the term mobile home. For example, in 1975, two years before these Covenants were drafted, the Third Circuit Court of Appeal in Mouille, supra, considered Webster's definition for mobile home as "a trailer that is used as a permanent dwelling." Mouille at 378. At the same time of that ruling, La. R.S. 51:911.22, which was included in Louisiana's Uniform Standards Code for Mobile Homes, provided a definition as follows:
(5) "Mobile home" means a factory-assembled structure or structures equipped with the necessary connections and made so as to be readily movable over roads and highways as a unit or units, which exceeds eight body feet in width or is thirty-two feet or more in body length and is designed for occupancy with or without a permanent foundation. It may consist of one or more units which can be telescoped when towed and expanded later for additional capacity, or may consist of two or more units, separately towable but designed to be joined into one integral unit.
Act 281 of 1974. Later, this definition in the Revised Statutes was amended several *1091 times. At one point, "mobile home," "manufactured home" and "manufactured housing" were used together in La. R.S. 51:911.22 and said to be interchangeable. Act 576 of 1984. The present version of the statute defines mobile home differently from manufactured home. La. R.S. 51:911.22. Finally, in our law pertaining to highway regulations, La. R.S. 32:1 has its own definition of "mobile home" placing emphasis on the "trailer or semitrailer" design of the structure which "is equipped for use as a conveyance on highways."
At trial, the Mutters attempted through expert testimony to raise distinctions between a mobile home and a manufactured or modular home. The mobile home was said to have a permanent chassis that forms a part of its structure, while the Mutters' home was moved on a separate transporter/trailer and lifted into place onto a permanent foundation. An executive of the company that built the Mutters' home testified that the modular home was built to the same building codes as a pier-and-beam constructed home. The building standards for a mobile home were said to be different. Also, the testimony discussed the legal requirement for a mobile home to have a vehicle identification number for transport as a vehicle while no such requirement applied to the Mutters' home.
Noteworthy distinguishing features of the Mutters' home are its roof pitch and attic space. The photos of the home as it was moved on a trailer into the subdivision reveal that its roof was incomplete with only a lower, temporary roof covering each home section. The lower roof obviously allowed for easier transport along the highway. Once at its destination, a steeper roof with rafters was added to each section, and a gabled roof with attic space comprised the finished structure. Foster's manufactured home located next door had an even steeper roof since his modular home units were designed to accommodate an upstairs living area.
Contrary to the plaintiffs' argument, the term "mobile home" does not have such a generally prevailing meaning as to clearly include all forms of manufactured housing, hence the need to detail the scope of its meaning as illustrated by varying definitions in our statutes. Another reasonable and narrower interpretation might recognize the mobile home's origins as a trailer with a tow bar, comprising a single self-contained living area and designed to sit on its own axle. Our ruling in Smith had little difficulty recognizing that the single unit mobile home in that case was essentially a "trailer," which was the only term utilized in the early version of the "temporary structure" restriction which Smith addressed. The court observed:
By whatever name, these homes convey to reasonable minds a rather elongated structure (10 to 14 feet in width by 40 to 80 feet in length), capable of being towed on the highways, with axles and wheels attached to the frame of the structure. The very name mobile or trailer conveys this meaning. The overall appearance, as distinguished from exterior decor, of one mobile home is not grossly dissimilar to another, and in the eyes of reasonable men, they all "look alike." We also take note that occasionally they may be immobilized on a particular location, but nonetheless, remain capable of being mobilized without too much effort and expense. They are not so much "constructed" or "assembled" even in a small part on the location the owner desires but are "connected" to sewerage and utilities. Indeed, one of their greatest selling points is their complete containment, ease of connection, and mobility.
Smith v. DeVincent, supra at 263.
The Mutters' home was assembled; its roof and attic constructed; and its remobilization *1092 would now require much effort and expense. Though double-wide trailers requiring assembly existed at the time of Smith (see Act 281 of 1974), this court's definitional description plainly suggests that modern manufactured housing units designed for placement on a foundation by a crane and requiring roof construction would not be included in its 1975 view of the trailer/mobile home.
Moreover, as seen by the detailed definitions for "mobile home" utilized in the above Louisiana statutes, careful drafting avoids the question of whether a mobile home with a permanent foundation is still to be considered a mobile home. That question is reasonable, and the question raises doubt. In the Mitchell case, the subdivision restrictions were clear that an immobilized mobile home would not be considered as an acceptable permanent residence because they further provided that every residence also be constructed on site. Other restrictions specifying aesthetic features of a residence could also effectively prevent most manufactured housing in a subdivision if that is indeed a goal for the subdivision plan.
In summary, we determine that issues exist in the Covenants creating reasonable doubt under Civil Code Article 783 as to the extent of the application of these building restrictions for Cypress Point Subdivision. There is doubt as to the meaning and scope of the term "mobile home." Mobile structures are allowed to be "placed" in the subdivision with no requirement that every residence be "erected" on site. Most significantly, even if the term mobile home may be broadly construed to include all forms of manufactured and modular housing, the context of Restriction # 8 suggests a limited interpretation for its application. That interpretation of Restriction # 8 prevents the placement on a lot of such manufactured housing with a less than permanent foundation for use as an outbuilding serving the main dwelling. Such an interpretation by a third party viewing the public records and reading these Covenants is reasonable, whether or not it is the only interpretation that can be understood for Restriction # 8. It thus becomes the interpretation the law mandates for the most free and unrestrained use of the immovable.

Conclusion
The permanent injunction issued by the trial court is reversed. Costs of appeal are assessed to appellees.
REVERSED AND RENDERED.
NOTES
[1] The trial court noted that a similar action was pending against Foster, who lives next door to the Mutters.
[2] The architectural control provision has not been raised by the parties as operative in this case with enforcement by the Control Committee. We cite the provision to show that the control envisioned by the provision does not appear to address outbuildings or the temporary structures discussed in Restriction # 8, since such restriction can be interpreted as totally barring placement of such temporary structures in the subdivision.