996 So.2d 553 (2008)
Gary Lynn HONEYCUTT, et al., Plaintiffs/Appellees
v.
Virginia Ann BROOKINGS, Defendant/Appellant
Virginia Ann Brookings, Plaintiff/Appellant
v.
Gary Lynn Honeycutt & Tatiana I. Honeycutt, Defendants/Appellees
Virginia Ann Brookings, Plaintiff/Appellant
v.
Paul Miller & Judy Miller, Defendants/Appellees.
Nos. 43,605-CA, 43,606-CA, 43,607-CA.
Court of Appeal of Louisiana, Second Circuit.
October 1, 2008.
*555 Blanchard, Walker, O'Quin & Roberts by M. Thomas Arceneaux, Shreveport, for Appellant, Virginia Ann Brookings.
Wiener, Weiss & Madison by Geoffrey D. Westmoreland, Amanda E. Waddell, Shreveport, for Appellees, Gary Lynn Honeycutt, et al.
Before PEATROSS, MOORE & LOLLEY, JJ.
PEATROSS, J.
Neighbors of veterinarian Dr. Virginia Brookings sought injunctive and declaratory relief alleging violations of the use restrictions in the protective covenants of Lawler Gardens Subdivision in Blanchard, Louisiana, because of Dr. Brookings' dogs and newly constructed outbuilding/kennel. The trial court initially issued a preliminary and permanent injunction, ordering that the seven dog runs extending from the outbuilding/kennel be dismantled and that all dogs be kept inside Dr. Brookings' residence and not in the outbuilding/kennel. Following a motion for new trial, in an amended and restated judgment, the trial court maintained the order for removal of the dog runs, but allowed two of the dogs (same two dogs) to be considered "outside" dogs. Dr. Brookings appeals. For the reasons stated herein, we affirm.

FACTS
Dr. Brookings resides in Lawler Gardens Subdivision in Blanchard, Louisiana. The subdivision is a semi-rural setting, with large lots, some of which include several acres of land. Dr. Brookings raises and shows dogs  mainly, miniature Doberman pinschers and Japanese Chins. The record reflects that, for some years, at least since 1998, Dr. Brookings has housed approximately 10 dogs at her residence (and at times as many as 20), with the dogs eating and sleeping inside the residence, but having extended periods of unattended recreational time outside in the backyard.
The Millers, plaintiffs herein, live next door to Dr. Brookings. The Honeycutts, also plaintiffs herein, live across the street from Dr. Brookings. All parties acknowledge that Dr. Brookings has had dogs for years; however, the Millers and Honeycutts argue that it was not until the building of the outbuilding/kennel at issue in this case that the dogs and their housing became a problem in the neighborhood.
In 2003, Dr. Brookings built two outside kennels for the dogs immediately adjacent to the Millers' property. The photographs in the record show this to be a small chain link fenced area. There is, however, some dispute in the testimony as to how extensively this fenced area was used for kenneling Dr. Brookings' dogs.
Around November 2006, Dr. Brookings began construction of a 900 square foot outbuilding/kennel in her backyard with 7 dog runs connected thereto to house the dogs. The runs are indoor/outdoor with guillotine-style dog doors connecting each outdoor run to the indoor unit. Unless the dog doors are closed, the dogs can run freely inside or outside in the runs. Each run can house 2 dogs; the facility can house 14 dogs total. The structure was built on a slab and is fully plumbed, heated and cooled.
On or about the day that construction was beginning on the outbuilding/kennel, Dr. Brookings approached Mr. Miller and advised him that she was remodeling her kitchen and building the facility for the dogs. Mr. Miller had subsequent conversations *556 with the contractor and workers from whom he learned the specific plans for the building, including that it was to be 900 square feet, fully plumbed and have built-in chain link dog runs. There is some discrepancy in the testimony as to the exact conversations that took place, but it is undisputed that Mr. Miller voiced his objection to the building to Dr. Brookings and, alternatively, requested that the building be moved farther back on the lot. Dr. Brookings, however, continued with the construction as planned. The record also reflects a conversation between Mr. Honeycutt and Dr. Brookings wherein Mr. Honeycutt objected to the building of the kennel facility. In any event, construction continued and the kennel facility was completed. On completion of the facility, all of the dogs were housed in the kennel. Dr. Brookings testified that she closed the dogs inside the building at night, but admitted that the dogs had free run of the indoor/outdoor runs during the day. The dogs did not stay in her residence once the kennel was completed.
Mr. Miller testified that he could hear the dogs barking from the inside of his residence. He further testified that he often goes outdoors during the nighttime hours to smoke and that the dogs would come outside into the runs and bark incessantly at him. Mr. Miller also complained of the obstruction of view created by the outbuilding/kennel from his backyard. Mr. Honeycutt testified that he too could hear Dr. Brookings' dogs barking from across the street, mainly in the mornings and evenings.[1]
Plaintiffs hired an attorney who sent a demand letter, dated December 20, 2006, to Dr. Brookings, advising her that the activity was in violation of the protective covenants of the subdivision and demanding that construction cease. Following the first demand letter, Plaintiffs' counsel failed to move the case along; and, therefore, Plaintiffs hired other counsel. A second demand letter was sent by new counsel to Dr. Brookings on January 22, 2007, all to no avail. This suit for injunctive relief followed.
As previously stated, the trial court granted Plaintiffs' request for injunctive relief, finding that the outbuilding/kennel was violative of the use restrictions of the protective covenants of Lawler Gardens Subdivision. In the amended and restated judgment, the trial court ordered Dr. Brookings to dismantle and remove the outdoor dog runs from the outbuilding/kennel. The court further stated that Dr. Brookings could have two outdoor dogs, provided they were the same two dogs, and all other dogs were to be kept in her residence as much as possible. Finally, the trial court ordered that all dogs be housed in the residence, not the outbuilding/kennel. This appeal ensued.

*557 DISCUSSION

On appeal, Dr. Brookings assigns the following as error (verbatim):
1. The District Court erroneously concluded that the Outbuilding violated the Use restrictions.
2. If the Outbuilding did violate the Use Restrictions, the District Court erroneously concluded that the restriction against detached buildings was not abandoned.
3. If the restriction against detached buildings was not abandoned, the District Court erroneously concluded that the restrictions against detached buildings had not perempted or prescribed as to Dr. Brookings' lot.
4. The District court erroneously concluded that Dr. Brookings' dogs were not outside dogs, such that any restriction against more than two outside dogs perempted or prescribed because the dogs had been at Dr. Brookings' property in excess of two years prior to this action.
5. To the extent Dr. Brookings' dogs were not outside dogs, the District Court erroneously required the dogs to be kept in Dr. Brookings' house "as much as possible," as the extended outside stays by the dogs would not make them outside dogs in violation of the Use Restrictions.
6. To the extent the presence of a large number of dogs would constitute a nuisance or annoyance in violation of the Use Restrictions, the District Court erroneously failed to conclude that no action could be brought based on the violation because the activity had been conducted for well more than two years prior to the institution of this action.
7. The District Court erroneously concluded that exterior dog runs or pens violated the Use Restrictions and, if they did, the District Court erroneously concluded that any action to require removal of the dog runs had [not] (sic) prescribed or perempted.
These assignments of error collectively raise three primary issues, which will be addressed in turn. The first inquiry is whether the outbuilding/kennel and/or dog-related activities on Dr. Brookings' property are violative of the use restrictions of the protective covenants of the subdivision. The second question concerns whether any or all of the restrictive covenants have been abandoned. The third issue is whether the action to enjoin any violation of the restrictive covenants has prescribed by the passage of two years without complaint by the neighbors.

The Use Restrictions
Building restrictions are sui generis real rights which may be enforced by mandatory and prohibitory injunctions. In a subdivision subject to building restrictions, each landowner is adversely affected by violations and, therefore, has a substantive right and procedural standing to enforce the building restrictions. Harrison v. Myers, 25,902 (La.App. 2d Cir.6/22/94), 639 So.2d 402, citing Lakeshore Property Owners Ass'n, Inc. v. Delatte, 579 So.2d 1039 (La.App. 4th Cir.1991), writ denied, 586 So.2d 560 (La.1991).
Lawler Gardens Subdivision contains 14 lots. The protective covenants of the subdivision were adopted September 10, 1992, and the use restrictions thereof provide, in pertinent part, as follows:
1. LAND USE AND BUILDING TYPE. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than detached *558 single-family dwellings not to exceed three (3) stories in height.
2. DWELLING SIZE. The floor area of the main structure, exclusive of all exterior storage, whether attached or detached, open porches and garages, shall be not less than eleven hundred (1,100) square feet. No building shall have less than fourteen hundred (1,400) square feet, which will include floor area, covered porches and/or carports.
* * *
11. NUISANCES. No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.
* * *
12. TEMPORARY STRUCTURES. No structure of a temporary character, trailer, basement, tent, shack, garage, barn, or other outbuilding shall be used on any lot any time as a residence, either temporarily or permanently.
* * *
16. LIVESTOCK AND POULTRY. No animals, livestock, or poultry of any kind shall be raised, bred or kept on any lot, except dogs, cats or other household pets may be kept, provided they are not kept, bred or maintained for commercial purposes. Nor more than two (2) outside dogs per family will be permitted. The Caddo Parish Leash Laws shall apply at all times.
Building restrictions, including protective covenants of subdivisions, are subject to the general rules of contract interpretation. La. C.C. art. 783; Head v. Gray, 41,290 (La.App. 2d Cir.8/23/06), 938 So.2d 1084, writ denied, 06-2353 (La.12/15/06), 945 So.2d 690. Doubt as to the existence, validity or extent of building restrictions is resolved in favor of the unrestricted use of immovables. La. C.C. art. 783.

The Outbuilding/Kennel
Read together, use restrictions numbers 1 and 2 clearly contemplate exterior storage structures in addition to the single family residence allowed on each lot. Clarification is provided in use restriction number 12, which provides that any structure of a temporary nature must not be used as a residence. It is this court's opinion that such "temporary structures" encompass the contemplated exterior storage structures referenced in use restriction 2. In summary, the use restrictions allow exterior storage structures of a temporary nature in addition to the residence as long as the exterior storage structure is not used as a residence.
Applying this interpretation of the use restrictions, we find that the trial court was legally correct in concluding that the outbuilding/kennel constructed by Dr. Brookings violates the restrictions. Photographs contained in the record show a commercial grade kennel facility. The building is 900 square feet, on a permanent slab and has plumbing and central heat and air conditioning. The outdoor dog runs are also positioned on the slab. The only other building of a permanent nature in the subdivision referenced in this case is a detached garage built on a slab adjacent to Mr. Honeycutt's residence. This garage was constructed, however, prior to the adoption of the protective covenants of the subdivision.
After reviewing the photographs and testimony pertaining to the other neighborhood exterior storage buildings, we find them all to be of a temporary nature. Specifically, Dr. Brookings asserts that, in *559 1996 or 1997, she and her former husband constructed a red building behind the residence that her former husband used as a guitar shop for years. She argues that it was not temporary, but permanent, as it was built on site and had electrical power. Dr. Brookings likens the red "guitar" shop to her outbuilding/kennel and further characterizes the kennel facility as one for storage, dog housing and hobbies. We are not persuaded by this argument and find telling the fact that the red "guitar" shop is no longer located on the property, having been removed in 2002. In addition, the photographs support the conclusion that the other exterior structures in the neighborhood are temporary. See Mitchell v. Killins, 408 So.2d 969 (La.App. 2d Cir.1981).

Nuisance
Although Dr. Brookings is correct in her observation that the use restrictions do not specifically prohibit an outdoor dog kennel, we find that, under the specific facts of this case, there is no error in the conclusion that the dog-related activity at Dr. Brookings' outbuilding/kennel facility was violative of use restriction 11, prohibiting nuisance or annoying and offensive activity to the neighborhood. Mr. Miller and Mr. Honeycutt testified as to the barking of the 13 dogs and Mr. Miller testified that the dogs are free to run outdoors at will. Significantly, Dr. Brookings admitted in her testimony that 13 dogs at large on the property could be a nuisance.

Abandonment of Use Restrictions
Once a plaintiff seeking an injunction has established a violation of a restriction, the burden shifts to the defendant to prove a termination or abandonment of that restriction. Harrison, supra. La. C.C. art. 782 provides:
Building restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction. When the entire plan is abandoned the affected area is freed of all restrictions; when a particular restriction is abandoned, the affected area is freed of that restriction only.
Comment (b) to the article states, in pertinent part:
Abandonment of a particular restriction is predicated on a sufficient number of violations of that restriction in relation to the number of lots affected by it.
In the case sub judice, the trial court properly found that the exterior structures on other properties in the subdivision were not violations of the use restrictions as they are all of a temporary nature. These other exterior structures cannot, therefore, serve as a basis for abandonment of the use restrictions. The only other structure that might be characterized as permanent in nature is Mr. Honeycutt's garage, which, as previously stated, was constructed prior to the adoption of the restrictions. In any event, the presence of one other permanent structure would be insufficient to support a defense of abandonment.

Prescription
La. C.C. art. 781 provides that no action for injunction or damages on account of a building restriction violation may be brought after two years from the commencement of a noticeable violation. The comments to the article state that, once prescription has run, the restriction "is treated as if it never existed on a piece of land." La. C.C. art. 781, comment (c).
Dr. Brookings again argues that the red "guitar" shop building was permanent in nature and existed as a noticeable violation of the use restrictions for approximately four years with no complaint. She *560 submits, therefore, that her property is freed from the restriction under article 781. For the reasons set forth above, we find no merit in this argument. The red building was not permanent in nature as it was removed from the backyard in 2002; and, therefore, it cannot provide the requisite noticeable violation to free Dr. Brookings' property from the use restriction.
Dr. Brookings further asserts that any violation of the nuisance restriction has been abandoned because she has had many dogs at her residence for years with no complaints from her neighbors. Necessary to the determination of this issue is classification of the dogs as indoor or outdoor dogs both prior to and subsequent to the building of the outbuilding/kennel facility. The testimony of Dr. Brookings and Mr. Miller is consistent that, before the kennel was built, the dogs were fed mostly inside the residence and always slept inside. Although the dogs were allowed to defecate and urinate in the backyard, and also exercise, sometimes for extended periods of time during the day, the dogs were housed in crates inside the residence and were not left outside overnight. At that time, the dogs closely fit the definition of "indoor dog" provided in Section 4-3(y) of the Caddo Parish Animal Ordinance, which defines an indoor dog as "any dog that lives inside the dwelling, is not left outside unattended, eats and sleeps inside the dwelling." A dwelling is defined in Section 4-3(t) as "the house or other structure in which one or more persons live." Prior to the completion of the outbuilding/kennel, Dr. Brookings' dogs were indoor dogs.
In contrast, on completion of the outbuilding/kennel facility, the dogs were housed in the new building. Dr. Brookings testified that the dogs were housed inside the facility at night and had the run of the indoor/outdoor runs during the day. The dogs no longer ate and slept inside the dwelling of Dr. Brookings, but were left outside unattended the majority of the time. The dogs became outdoor dogs with their move to the outdoor kennels.
The critical element to be gleaned from the classification of the dogs is found in Mr. Miller's testimony pertaining to the change in the level of barking or offensive activity with the completion of the kennel facility. Dr. Brookings argues, however, that the action is prescribed because she had so many dogs for more than two years and none of the neighbors complained. This argument misses the critical element, however, because the dog-related activity was not a nuisance or actionably annoying or offensive until the dogs became outdoor dogs and began living full-time in the kennel facility which allowed them to go outside at will. In other words, there was no noticeable violation until the outbuilding/kennel came into use in November or December. Suit was filed in January; therefore, the request for injunctive relief was not prescribed under article 781.
In summary, we find no error in the trial court's conclusions in the case sub judice. The trial court fashioned the most equitable remedy possible under the circumstances of this case, without requiring costly demolition of the outbuilding. By ordering the runs to be dismantled and the dogs to be kept in the residence, the judgment assures that the dogs will not be allowed to run at large in the outdoor runs. Finally, Dr. Brookings is allowed two outdoor dogs by law and there is no error in that portion of the judgment.

CONCLUSION
For the reasons stated herein, the judgment of the trial court is affirmed at the cost of Appellant, Virginia Ann Brookings.
AFFIRMED.
NOTES
[1] At the time Dr. Brookings built the outbuilding/kennel, she was a member of the Caddo Parish Animal Services Board ("the Board"). Dr. Brookings testified that, after the dispute herein arose, she became aware that it would be necessary for her to obtain a noncommercial kennel permit from Caddo Parish Animal Services because of the kennel facility at her residence. On the application for the non-commercial permit, dated April 27, 2007, which is contained in the record, Dr. Brookings indicated that she owned 13 show dogs for conformation and obedience and listed the name of the business as VaBrook Kennels. The application was approved May 4, 2007, and the Animal Establishment Permit was issued to VaBrook Kennels on March 9, 2007. The permit allows the permit holder to kennel 1-49 dogs on the premises. Dr. Brookings further testified that, to avoid any potential conflict of interest as a non-commercial kennel permit holder, she resigned her position on the Board. Her letter of resignation to the Board, dated April 26, 2007, is contained in the record.