JUDE G. GRAVOIS, Judge.
| gDefendant/appellant, 310 Investments, LLC (“310”), owns property located in a business park developed by plaintiff/appel-lee, Esperanza Land, LLC (“Esperanza”). 310’s property is subject to Esperanza’s recorded building restrictions. When 310 began making improvements on its property without Esperanza’s prior approval, as required by the restrictions, Esperanza sought and was granted a preliminary injunction that restrained, enjoined, and prohibited 310 from making any further improvements to its property. 310 now appeals the trial court’s judgment granting the preliminary injunction. For the following reasons, we affirm the trial court’s judgment.

FACTS AND PROCEDURAL HISTORY

Esperanza developed the “Esperanza Business Park” located on the west bank of St. Charles Parish in Luling, Louisiana. Esperanza intended the business park and property and lots located therein to be subject to building restrictions. Accordingly, on May 17, 2006, Esperanza recorded in the conveyance records of St. Charles Parish a document entitled “Declaration of Building Restrictions for [¡¡Esperanza Business Park” (hereinafter, “the building restrictions”). On Décember 21, 2006, 310 purchased Lot 3 in the business park subject to the building restrictions.
In or around October 2013, Timothy Mayeux met with representatives of Esperanza to discuss purchasing property from Esperanza to house his helicopter charter business, MYU' Flying Service, LLC. Mr. Mayeux did not purchase any property from Esperanza; however, upon learning that Mr. Mayeux was interested in purchasing Lot 3 in the business park from 310, Esperanza sent him a copy of the building restrictions. Further, on February 21, 2014, Esperanza notified Mr. Mayeux by letter that the building restrictions did not permit the operation of a heliport in the business park. Notwithstanding this information, on February 27, 2014, Mr. Mayeux’s company, MYU Investments, LLC, acquired ownership of 310, which owned Lot 3, on which Mr. Mayeux planned to house his helicopter charter business.
*864 Lot 3 was originally zoned “M-l” by the St. Charles Parish government.[1] In order to operate a heliport on Lot 3, the property needed to be rezoned to “AV-1.”[2] Thus, in November 2013, 310 filed an application to rezone Lot 3 from its M-l zoning classification to an AV-1 classification. 310 also submitted an application for a “Special Permit Use” with the St. Charles Parish Department of Planning and Zoning. Both applications stated that the contemplated use of the property was as a “[heliport.” Despite opposition from Esperanza and other adjacent property owners, on February 17, 2014, the St.’ Charles Parish Council rezoned Lot 3 from M-l to AV-1 and authorized the Special Permit Use.
|¿Considering the foregoing, Esperanza filed a petition for declaratory judgment and permanent injunction against 310 on March 21, 2014. Esperanza sought a judgment declaring that the construction and operation of a heliport on Lot 3 would be a violation of the building restrictions. Esperanza further sought an injunction to permanently enjoin and prohibit 310 from violating the building restrictions, to mandate that 310 cause Lot 3 to be rezoned back to its original M-l classification, and to take the necessary actions to revoke the Special Permit Use.
In response, 310 filed an answer and reconventional demand in which it admitted that it was in the process of developing a private heliport on Lot 3, but denied that this was a violation of the building restrictions. 'Further, 310 claimed that it was entitled to a declaratory judgment declaring that its intended use of Lot 3 was not prohibited by the building restrictions, 'or alternatively, that the provisions of the building restrictions regulating, use were abandoned, or in the further alternative, that the building restrictions could not be enforced against it as 310 detrimentally relied upon the conduct of Esperanza.
In July 2014, 310 submitted plans to Esperanza for approval of the “MYU Office and Warehouse” on Lot .3, On August 6, 2014, Esperanza notified Mr. Mayeux by letter that no intended use was listed on the plans. Assuming that the intended use of the “MYU Office and -Warehouse” was a heliport or helipad as previously admitted to, Esperanza rejected the plans finding them to be a violation of “the use limitations set out in the Restrictions.” Revised plans were submitted to Esperanza in December 2014; on January 28,2015, Esperanza again rejected the plans because of the intended use. In a letter dated February 23, 2015, Esperanza rejected the proposed plans for a third time for the same reasons.
In November 2014, Mr. Mayeux applied for and was later' granted two building permits for his proposed “office” and “warehouse/aircraft hangar.” ^Though 310 failed to obtain Esperanza’s prior approval of its proposed final building plans, 310 nonetheless began construction on Lot 3. In response, on March 25, 2Ó15, Esperanza filed an amended and supplemental petition in which it sought a temporary restraining order and preliminary injunction against 810 to enjoin and prohibit 310 from making any improvements on Lot 3 absent the approval of Esperanza until a final resolution of ’the permanent injunc *865 tion and declaratory judgment. On March 26, 2015, the trial court granted Esperanza a temporary restraining order, restraining, enjoining and prohibiting 310 from making any improvements to Lot- 3, specifically restraining 310 from constructing, placing or developing a heliport .on, the property. 310 filed a motion to dissolve the. temporary restraining order on March 27, 2015.[3]
The trial court conducted an evidentiary hearing on the application for the preliminary injunction and the motion to dissolve the temporary-restraining order on April 10 and 29, 2015. After witnesses, and evidence were presented, the trial court took the matter under advisement. On May 11, 2015, ther trial court issued a judgment granting the preliminary injunction and denying 310’s request to dissolve the temporary restraining order.[4] The trial court found in its reasons for judgment that 310’s commencement of work on the construction of a heliport without prior approval of Esperanza was a violation of the building restrictions, the building restrictions prohibit the development of a ‘heliport in the business park, and the restrictions were not previously abandoned. This timely appeal followed.

J£AW AND ANALYSIS'"

Á preliminary injunction is a procedural device, interlocutory in nature, designed to preserve the existing status pending a trial of the issues on the merits of the case. La. C.C.P, art. 3601; McCord v. West, 07-958 (La.App. 5 Cir. 3/25/08), 983 So.2d 133,140. A preliminary injunction is a summary proceeding and merely requires a prima facie showing of a good chance to prevail on the merits. Id. The petitioner is required to offer less proof than is necessary in an ordinary proceeding for permanent injunction.. Derbes v. City of New Orleans, 05-1249. (La. App. 4 Cir. 8/30/06), 941 So.2d 45, 53-54. The principal demand is determined on its merits only .after a full trial under ordinary process, even though the hearing on the summary proceedings to obtain the preliminary injunction may touch upon or tentatively decide merit issues. Smith v. West Virginia Oil & Gas Co., 373 So.2d 488, 494. (La.1979). Moreover, because a preliminary injunction is an interlocutory procedural device designed to preserve the status as it exists between the parties pending trial on the merits, a trial judge has great discretion to grant or deny the-relief requests. Derbes, supra.
 Building restrictions are charges imposed by the owner of an immovable in pursuance of a feasible general plan governing building standards, specified uses, and improvements and are sui generis real rights. La. C.C. art. 775; Harrison v. Myers, 25,902 (La.App. 2 Cir. 6/22/94), 639 So.2d 402, 404. . Building restrictions may be enforced by mandatory and prohibitory injunctions.. La. C.C. art. 779. Once a plaintiff seeking an injunction establishes a violation of a restriction, then the burden shifts to the defendant to prove a termination or abandonment of .that restriction. Harrison, supra.
Doubt as to the existence, validity, or extent of building restrictions is re *866 solved in favor of the unrestricted use. of the immovable. La, C.C. art. 783. |7However, when differences arise as to the extent or limitation of restrictions, courts must look to the expressed intention of the party encumbering the property as set forth in the instrument embodying the restrictions,' giving due consideration to the entire context of the document. Taormina v. Story, 435 So.2d 522, 524 (La.App. 5 Cir.1983).

ASSIGNMENT OF ERROR NUMBER ONE

In its -first assignment of error, 310 argues that Esperanza arbitrarily and capriciously rejected its building - plans. • According to’ 310, there is nothing in the restrictions that would permit Esperanza to withhold approval of the building plans on the basis of the intended use.
Article VI of the building restrictions entitled “Approval of Plans” states in pertinent part:
A. Submission and Approval of Plans No Improvements shall be erected, placed, altered, maintained or permitted to remain on any site" subject'.to
' these restrictions'until plans and specifications showing plot layout and all exterior elevations, with materials and colors therefore and structural design, signs "and' landscaping,' mechanical, electrical and plumbing detail and the nature, kind, shape, height and exteri- or color scheme of the materials to be incorporated into, and location of the proposed Improvements or alterations thereto shall have been submitted to and approved in writing by Esperanza Land, LLC. Such plans and specifications shall be submitted in writing over the signature of the owner or lessee of the site or his authorized agent.
B. Criteria for Approval
Approval shall be based on the following considerations and criteria: ■ (1) adequacy of site dimensions, (2) adequacy of structural design, (3) conformity and harmony of external design with neighboring structures, (4) effect of location and use of improvements on ’ neighboring sites, (5) relation of topography, grade and finished ground elevation of the site being improved to that of neighboring sites, (6) proper facing of main elevation with respect to nearby streets, and (7) conformity of the plans and specifications to the purpose and general plan and intent of these restrictions. Esperanza Land, LLC shall not arbitrarily or unreasonably withhold its approval of such plans and specifications.
JjjC. Presumptive Approval
If Esperanza Land, LLC fails either to approve or disapprove such plans and specifications within sixty (60) days after the same has been submitted to it, it shall be conclusively presumed that Esperanza Land, LLC has approved said plans and specifications; provided, however, the failure of the Architectural Control Committee to approve or disapprove such plans and specifications within the thirty (30) day review ,period shall not allow any . Improvements to be constructed, altered .or placed on any Lot in a manner inconsistent with or in violation of any provision of these Restrictions. Esperanza Land, LLC shall have full power and authority to reject any plans and specifications that (i) do not . comply with the restrictions herein imposed or meet its minimum structural and mechanical standards and requirements or architectural' design requirements or (ii) might not be compatible, in the sole discretion of Esperanza Land, LLC, with the design *867 or overall character and aesthetics of the Property or the harmony of external design or location in relation to property lines, building lines, servi-tudes, grades, surrounding structures, walks, and topography -(including the orientation of the front'and rear of any such building with respect to the Lot lines) —
310 argues that the restrictions give Esperanza the right to deny plans based on structural restrictions, -but not based on use restrictions. According to 310, Article VI(A) states what is to be submitted for plan approval, and the intended use of. the property is not something required -to be submitted. 310 points out that Article VI(B) concerning criteria for approval does use the word “use,” but not “intended use.” 310 finds Esperanza could have easily indicated that a criteria for approval was “whether or not the proposed use is allowed under the Restrictions,” but it did not. Further, Article VI(C) never mentions intended use as a ground for rejection. Therefore, according to 310, Esperanza arbitrarily rejected the plans based on the intended use when'it had no authority to reject the plans on that basis.
In support of its argument, 310 relies on La. C.C. art 783, in that any doubt as to the extent of building restrictions should be resolved in favor of the unrestricted use of the immovable. 310 also relies on Smith v. De Vincent, 322 So.2d 257 (La. App. 2 Cir.1975), in support of its argument. In Smith, a ^restriction prohibited any structure of a “temporary character” to be used as a residence on the property. Id. at 259. The defendants had placed mobile homes on their respective properties which they, were using as residences. Id, The court found that the restriction did not prohibit defendants from placing a mobile home on the property, but only prohibited -them- from using the mobile home as a residence. Id. at 264. ’ The court noted that if the restriction had intended to restrict both the structure on the property as well as prohibit the use of the structure, the restriction should have and could have phrased it to expressly provide for that. Id. at 263. 310 argues that in the same regard, if Esperanza wanted the right to refuse plans based on the intended use, it should liave written that into the restrictions.' ’
Though La. C.C. art 783 holds that doubt as to the extent of building restrictions is resolved in favor of the unrestricted use of .the immovable, jurisprudence confirms that whenever differences arise as to the extent or limitations of restrictions, courts must look to the expressed intention ,of the party encumbering the property as set forth in the instrument embodying the restrictions, giving due consideration to the entire context of the document. Taormina, supra; Smith, supra at 260-261.
In considering the entire document, it is clear that Esperanza intended to govern use of the property in the business park and use- would be considered when approving plans for improvements in the business park; Article 11(B) entitled “Purpose of-the Restrictions,” states:
The purp'ose of these reductions is to insure proper development and use of the Property, to' protect the owner of each parcel against’ improper development and use of surrounding parcels as will depreciate the-value of his parcel, to prevent the erection on the Property of structures built of improper design or materials, to encourage the erection of attractive improvements at appropriate locations, to prevent haphazard and inharmonious improvements to secure and maintain proper setbacks- from streets and adequate free |1nspaces between structures, and in general, to provide *868 adequately for a high quality of improvements. on the Property. (Emphasis added.)
Article VII of the building restrictions is dedicated entirely to “Permitted Uses and Operations.” Further, Article Vt(B) states that approval of plans shall be based on a number of criteria including, “(4) the effect of location and me of improvements on neighboring sites” and “(7) conformity of the plans and specification to the purpose and general plan and intent of these restrictions,” (Emphasis added.) Finally, Article VI(0)(i) allows the rejection of any plans which do not comply with the building restrictions.
In Smith, the trial court determined that the restriction was a use restriction only and should not be broadly interpreted so as to extend to that of a structural restriction. ’ Unlike Smith, the analysis in this assignment of error does not seek to determine if a specific restriction extends to a use and/or a structural restriction. It only seeks to determine if Esperanza could reject the plans based on use. The restrictions expressly identify permitted and prohibited uses. The restrictions state that use of the-improvements .as well as the purpose of the restrictions will be considered as criteria for approving plans. The purpose of the restrictions as clearly stated above is to insure the proper development and use of the property. Considering the intention of Esperanza from the entire context of the document, we find it was not unreasonable for Esperanza to deny the plans based on the intended use. Further, considering that Esperanza made a prima facie case that a heliport is not a permitted use under the building restrie-tions, as discussed infra, we find the trial court did not err.in determining that commencement of work on a heliport without prior approval of plans was a violation of the building restrictions. This assignment of error is without merit. .

^ASSIGNMENT OF ERROR NUMBER TWO

In its second assignment of error, 310 argues that the trial court erred in finding that its proposed “office warehouse” is not a permitted use under the building restrie-tions. .
The “Permitted Operations and Uses” of the property are set forth in Article VII of the building restrictions. Article VII(A)(1) establishes five uses of the property that are allowed in the business park and specifies that “no others will be permitted on the property.” Those five permitted'uses are:
a) Office buildings (including trade or business schools); or
b) Office/warehouse facilities where the warehouse is an integral part of the facility; or
c) Mini Storage Facilities; or
d) Light industrial operations: Light industrial operations shall be limited to warehousing, distribution, industrial schools, truck marshaling, and light manufacturing. Light industrial usage permitted hereunder shall be carried out entirely within a building that is designed and constructed so that the enclosed operations and uses do not cause or produce a nuisance to adjacent lots, including by way of illustration but not limitation, vibration, sound, electromagnetic disturbance, radiation, air or water pollution, dust or emission of odorous, toxic, or non-toxic matter. Further, all lighting is to be shielded and confined within property lines; or
e) Retail businesses.
Article.VII(B)(2) of establishes “Prohibited Operations and Uses” and states that *869 the “following operations and uses shall not be permitted on any of the Property”:
a) Trailer Courts
b) Labor camps
c) Junk Yards
d) Commercial excavation of building, or construction materials
e) Distillation of bones
f) Dumping, disposal or incineration of garbage or refuse in any form
hag) Pat rendering
h) Stockyard and slaughter of animals'
i) Refining of petroleum or of its products
j) Smelting of iron, tin, zinc, or other ores
k) Cattle or hog raising or raising of any other animals or poultry
l) Any and all heavy. industrial uses, except concrete and/or asphalt batch plants in area zoned M>-2 in Lot- No, 1.
On appeal, 310 argues that its “MYU Office and Warehouse” is permitted under Article VH(A)(i)(b)' and (d). First, 3Í0 argues that what it is building is an “office warehouse” as permitted under Article VH(A)(1)(b). 310 argues Article VII(A)(1)(b) identifies permissible uses by describing the type of structure which may be built, and the evidence , presented supports a finding that 310 plans to build an office warehouse where the warehouse is an integral part of the facility. 310 also argues that a heliport is a permissible use under Article VTI(A)(í)(d), as it would constitute “light industrial operations.” The trial court stated in its reasons for judgment that because 310 cannot operate a heliport entirely within the building, a requirement of “light industrial operations,” then a heliport'is not a permissible use under this restriction. On appeal, 310 argues that the trial court interpreted the term “light industrial operations” to prohibit any use outside of the building, and that this would lead - to absurd results.
310 purports that it'is building an “office warehouse facility” in accordance with Article VH(A)(l)(b)'. Stephen Villavaso, 310’s expert in land use planning, master planning, and zoning, testified that what 810 proposes to build is a “warehouse with some offices included in the warehouse surrounded by landscaping, walkways, and some concrete pads.” However, 810 also admitted, on' several occasions, that it is building a heliport' that will be used to house and grow MYU Plying Service, LLC. The original applications to-rezone the property and to ^receive -the Special Permit Use both identify “heliport" as the Contemplated use Of the property. 810’s Answer to the Petition for Declaratory Judgment and Permanent Injunction states that 310 plans to build a “heliport” on the property. Brady Garrity, the registered architect hired by MYU Service, LLC, testified at the evidentiary hearing that the office warehouse building was not a-single purpose facility and could be used for many different occupancies, but also testified that the' most current design is for a heliport and a hanger. At the evi-dentiary hearing, Mr. Mayeux acknowledged on cross-examination that he is building a “heliport” that will be used to house MYU Flying Service, LLC.
Mr. Mayeux' testified as to the operations of MYU Flying Service, LLC. According to Mr. Mayeux, MYÜ Flying Service, LLC is a “185 charter operator” that provides “helicopter charters, services, to the public.” Mr. Mayeux testified that MYU Flying Service, LLC is currently located behind his residence in. Luling from which he operates “5 helicopters out of [sic] 24 hours a day.” The business provides transportation of people and materials to different companies. Fifty percent of its work includes transporting, peo- *870 pie, and the other fifty percent of its work is transporting goods. He testified that the operations of the helicopters are outside, mainly coming and going. According to Mr,. Mayeux, he intends to operate a similar helicopter business on Lot 3 from which helicopters come and go, and are maintained, fueled and loaded with passengers, equipment, and materials.
At the evidentiary hearing, Gary Bou-dreaux, “member vice president” of Lamar Contractors, a business located on Lot 1 in the business park, and member of Twiner Properties, LLC, owner of Lot 1 and Lot 2 in the business park, testified as to how a heliport would affect his property.[5] Mr. Boudreaux testified that “our biggest concern is having our office buildings and warehouse buildings that close | uto a heliport with the noise and the safety issues that .are associated with a heliport. Helicopters taking off and landing.” According to Mr. Boudreaux, Mr. Mayeux has flown his helicopters over his building about 20 times over the past year to year and a half, and it disturbs and disrupts his business. Mr. Boudreaux stated that “You can’t hear on the telephone,” and that it was louder than the traffic on the neighboring interstate.
Video of Mr. Mayeux taking sound decibel readings of the noise associated with the helicopters was taken and submitted into evidence at the hearing. Mr. Mayeux also testified regarding those readings. He testified that when he was standing 30 feet from the helicopter, the device measured up to “80 — 95 decibels.” To compare, while standing approximately 25 feet away from Interstate 310, the decibel reading was “75, 78” until a big truck passed making it jump to as high as 86. However, Mr. Mayeux also admitted on cross-examination that he is not a sound engineer and has not been trained in using sound measuring devices. He never used one before taking these readings. He also admitted that the noise generated by the helicopters occurs outside of the hanger, and it may cause sound disturbances to the adjacent properties.
Deborah Vial, manager of Esperanza’s day-to-day operations, testified that the “goal and objective” of the building restrictions was to allow for orderly development in the business park. Mr. Hank Tatje, Esperanza’s expert in the area of real estate appraisal, real estate brokerage, property management, and real estate development, testified that it is important to have compatible uses within the same business park. According to Mr. Tatje, restrictions are added on top of zoning requirements to tighten up and steer the development and direction of the business park above what zoning requirements do. He testified that a heliport would not be allowed by either the M-l zoning rules or the building restrictions. Additionally, | ^according to Mr. Tatje, if a heliport was built there, any property adjoining it would be negatively affected. He testified that he suspects there would be a loss in value of the property with the heliport.[6]
*871 Upon review of the evidence presented, we find that the trial court did not abuse its discretion in finding that Esperanza presented a prima facie case that a heliport is not a permitted use under the building restrictions. Derbes, supra. Though labeled an “office warehouse,” it is clear (as admitted by Mr. Mayeux) that the intended use of the property is not only as an office/warehouse, but also a heliport, a use which required a change from the original zoning classification of M-l to AV-1. 310 argues that the trial court erred when in its reasons for judgment it sought to distinguish between a “warehouse” and a “hangar”, based upon the use to which the structure are put. However, we find no error in that distinction, as the trial court was interpreting restrictions on use.
Further, we do not find that the trial court interpreted the term “light industrial operation” to prohibit any use outside of the building. The purpose of the requirement that the light industrial usage be carried out entirely within .a building is “so that the enclosed operations -and uses do not cause or produce a nuisance to adjacent lots, including by way of illustration but not limitation; vibration, sound, electro-magnetic disturbance, radiation, air or water pollution, dust or emission of odorous, toxic or non-toxic matter.” (Emphasis added.) Adequate evidence was presented that the operation of Mr. May-eux’s business would require the constant coming and going of helicopters which could present a “nuisance” to adjacent lots, as that term is used in the building restrictions. Thus, [ 1fiEsperanza presented a pri-ma facie case that a heliport is not a permissible “light industrial operation” under the restrictions.
Mr. Mayeux was informed prior to acquiring Lot 3 that Esperanza had determined that a heliport, was not a permitted
use in the business park under the building restrictions. Though the building restrictions do not specifically prohibit use of property in the business park as a heliport, such use does prove inconsistent with the purpose and intent of the building restrictions. Mr. Tatje testified that the heliport could decrease the value of the adjacent property, directly in contradiction to the purposes of the building restrictions. Accordingly, considering all the evidence presented, we find that the trial court did not abuse its great discretion in finding that Esperanza presented a prima facie showing that it. would -prevail in proving that a heliport does not fall into the permitted uses, per the building restrictions, of the property located in the business park.

ASSIGNMENT OF ERROR NUMBER THREE

In its third assignment of error, 310 argues that Esperanza’s use restrictions have been abandoned. On appeal, 310 identifies “substantial” alleged violations of the use restrictions in the business park, including a cellular telephone transmission tower, a billboard, the St. Charles Parish Sheriffs Law Enforcement Complex, the St. Charles Humane Society, a warning siren tower, the St. Charles Parish Mosquito Control, and a concrete batch plant. Further, 310 argues that because some property within the park is subject to the restrictions and some is not, Esperanza is allowing uses within the business park that are not allowed by the restrictions whenever it suits Esperanza’s purposes. 310 argues that each of these violations is substantial and occurred with the participation of Esperanza and for Esperanza’s benefit or .to further a cause in which it had a particular interest. 117Given these “significant and recurring violations,” 310 believes that the limitations on use in the restrictions have been abandoned.
*872 Once a plaintiff seeking an injunction has established a violation of a restriction, the burden shifts to the defendant to prove a termination or abandonment of that restriction. Harrison, supra. Abandonment, as it relates to building restrictions, is governed by La. C.O. art. 782, which provides:
Building restrictions terminate by 'abandonment of the whole plan or by a general abandonment of a particular restriction. When the entire plan is abandoned the affected area is freed of all restrictions; when a particular restriction is abandoned, the affected area is freed of that restriction only;
'Comment B to Article 782 states, in pertinent part:
... Abandonment of the entire restrictive plan is ordinarily predicated on a great number of violations of all or most restrictions. Upon abandonment of the entire plan- all restrictions fall, and the use of the property is free for all purposes. Abandonment of a particular restriction is predicated on a sufficient number of violations of that restriction in relation to the number of lots affected by it. Thus, if a restriction requires that a building should face a certain street, or should be erected a'number of feet from the property line,' only violations on property subject to the same restrictions are considered in determining the question of abandonment. When the violations are sufficient in number-to warrant the conclusion that a particular restriction has been , abandoned, the property is: freed- of that restriction only.
The character, materiality, number of the violations, and their proximity to the objecting residents are all factors to be considéred in determining if a restriction has been abandoned by acquiescence. Harrison^ supra at. 404-405. Insubstantial, technical or infrequent violations of a restriction, which are not subversive to the general plan or scheme, weigh little towards establishing an abandonment. Id, at 405. Since not every violation will lead to abandonment, the court must look to the intention of those imposing and those seeking to continue the building restrictions. E, Parker Properties, Inc. v. Pelican Realty Co., 835 So.2d 466, 471 (La.App. 1 Cir.1976), writ denied 838 So.2d 699 (La.1976).
I isThe tidal court found that 310 did not present sufficient evidence of abandonment of the use restrictions. The trial court specifically found that the cell tower and billboard were legal non-conforming structures. The cell tower and billboard pre-dated establishment of the covenants. The trial court found that no evidence was presented to support the argument that St. Charles Parish Sheriffs Headquarters, the mosquito control center and the animal shelter were in violation of the restrictions. Finally, the trial court found that even if the warning tower was construed as a violation, its existence alone is insufficient proof of abandonment of the restrictions,[7]
Regarding the cell phone tower and the billboard, 810 argues on appeal that there is no provision contained in the restrictions which exempted structures then existing from the use restrictions. 310 notes that there is no jurisprudence on building restrictions where the court was called upon to determine whether or not pre-existing structures and uses were “grandfathered” by operation of law or whether or not they were subject to the restrictions when adopted. According to 310, Esperanza cites no statutes, cases, or commentary dealing with building restric *873 tions in support of its. claim that these, structures were “grandfathered” and not subject to the restrictions.
The record clearly reflects that both the cell phone tower and' the billboard were erected prior to the establishment of the business park and building restrictions. Though there is no “grandfather clause” in the restrictions, considering the intention of Esperanza in imposing the restrictions, we do not find that these structures can serve as a basis to claim the restrictions have been abandoned.
I mThe next alleged violation, according to 310, involves the St. Charles Parish Sheriffs Law Enforcement Complex on Lot 4B-2. 310 argues that the Sheriffs Law Enforcement Complex is “not limited to uses otherwise authorized under the Restrictions.”
Mr. Louis Authement, an attorney and husband of one of the owners of Esperanza, testified that Lot 4B was donated by Esperanza to St. Charles Parish in 2001 with the intention that the land would be used to develop a community center. The donation occurred prior to establishment of the building restrictions; however, the donation itself imposed certain use and time restrictions. The community center was not built within the time restrictions, and eventually the land was subdivided for the purpose of transferring a portion of the property to the Sheriffs Office. In connection with that transfer, Esperanza created an “Act of Acknowledgment and Approval of Land Use" that was executed to expressly make the transferred lot a part of the property to which the restrictions applied. The document also expressly approved the Sheriffs use of the property, which Mr. Authement testified was understood to be an office building. Considering the foregoing, we find as the trial court found that no evidence was presented that the Sheriffs Law, Enforcement Complex has violated the restrictions.
310 next argues that the Human Society is in violation of the use restrictions because it involves “the raising of any other animals,” which is specifically prohibited undér Article VII(B)(2) of. Though 310 could argue that this specific provision has been violated, we' find that this violation alone is not substantial enough to warrant abandonment of the entire use restrictions.
' Concerning the St. Charles Parish Mosquito Control building, 310 notes that Article IV(A) requires that any elevations of buildings facing streets be constructed of brick', concrete, masonry, stucco EFIS or concrete with an architectural treatment. Though the parish requested and received a waiver of this requirement, because it now has a partial metal facade on the front of the building, 310 argues the parish is in violation of the restrictions; No new argument is advanced on appeal as to how this is a substantial violation that would warrant abandonment of the entire use restrictions. ' Further, this requirement' is part of the “Building Regulations,” hot the use regulations, which is what 310 wishes to prove is abandoned.
310 next argues that the warning tower operated by the emergency operations center for St. Charles.Parish violates the restrictions. On appeal, 310 presents no support to its claim that this is a violation. As the trial court found, even if this is found to be a violation, its existence alone is insufficient proof of abandonment of the restrictions.
Finally, 310 argues that the use of a concrete batch plant that requires M-2 zoning on Lot 1 is not permitted under Article VII(A), even though it is expressly excepted from the prohibited uses by Article VII (B)(2): The trial court did not spec *874 ify anything in its reasons for judgment about the concrete batch plant. However, considering this use is expressly permitted in the building restrictions, we find this is not evidence that the use restrictions have been abandoned. Further, although some property within the business park is expressly subject to the restrictions and some is not, it does not follow that the use restrictions have been abandoned.
The burden of proof falls on the defendant to prove abandonment of a restriction. Harrison, supra at 404. Based on the evidence 310 presented to the court, we find no error in the trial court’s findings on this issue. Considering all of the foregoing, we find that the trial court did no err in finding that 310 did not meet its burden of proving that the use restrictions are abandoned.

^CONCLUSION

For the foregoing reasons, we affirm the trial court’s judgment granting Esperanza’s preliminary injunction prohibiting any further construction of a heliport on 310’s property pending resolution of the permanent injunction.

AFFIRMED

. St. Charles Parish defines an '‘M-1’'zoning district as a “light manufacturing and indus- , trial district," St. Charles Parish Zoning Ordinance of 1981, Section VI(D)(1).

. St. Charles Parish defines an "AV-I" zoning district as an "aviation district.” The "AV-I” policy statement notes that "[t]his district provides for airports, airfields, airstrips, aviation-related facilities and compatible industrial operations of all types.” St. Charles Parish Zoning Ordinance of 1981, Section VI(J).

. 310 also filed an exception of prematurity on March 30, 2015. After a hearing on April . 10, 2015, the trial court denied the exception of prematurity, finding that because 310 admitted it would be using the property for a heliport, the issue was not premature. The ruling on the exception is not before this Court for review.

. The trial court signed an amended judgment on May 14, 2015, fixing plaintiff’s security for issuance of the preliminary injunction and ordering the parties to follow all applicable requirements for appellate delays, and vacating the return date for the filing of writ' applications as had been provided in the May 11, 2015 judgment.

. The record reflects that Lot 2 is immediately adjacent to Lot 3.

. At trial, 310 objected to this testimony based on a Daubert challenge. See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court overruled the objection. In its reply brief, 310 argues that Esperanza failed to meet the Daubert standard, and therefore, Mr. Tatje’s testimony is unreliable and should be disregarded. However, pursuant to Rule 2-12.6 of the Uniform Rules — Courts of Appeal, an appellant’s reply brief shall be strictly confined to rebuttal of points urged in the appel-lee’s brief. In the instant case, 301's reply brief impermissibly goes beyond mere rebuttal and attempts to raise a new legal argument which, according to Rule 2-12.6, we are precluded from addressing.

. The trial court did not mention the concrete batch plant in its reasons for judgment.